UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JUAN SAMPEL,

    Plaintiff,

   v.

LIVINGSTON COUNTY, DOCTOR
AGUIRRE, NURSE ERIN HOWE,
CHIEF YASSO, and SGT. AARON
GALVIN,

    Defendants.
_____

**DECISION AND ORDER**

6:17-CV-06548 EAW

## INTRODUCTION

Plaintiff Juan Sampel ("Plaintiff"), a prisoner confined at the Ray Brook Federal Correctional Institution, filed this action *pro se* seeking relief under 42 U.S.C. § 1983 for alleged denial of medical care while he was housed as a pretrial detainee at the Livingston County Jail (the "Jail"). (Dkt. 1). Presently before the Court is a motion for summary judgment filed by defendants Livingston County, Doctor Aguirre, Nurse Erin Howe ("Nurse Howe"), Chief Deputy Yasso, and Sergeant Aaron Galvin ("Sergeant Galvin") (collectively "Defendants") (Dkt. 41), and a motion for a jury trial filed by Plaintiff (Dkt. 50). For the reasons explained below, the Court grants Defendants' motion for summary judgment and denies Plaintiff's motion for a jury trial.

## BACKGROUND

### I.   Factual Background

The following facts are taken from Defendants' Local Rule 56 Statement of Undisputed Facts (Dkt. 41-1), Plaintiff's Local Rule 56 Statement of Undisputed Facts (Dkt. 55 at 4-11), and their supporting documents.   Where the parties specifically controvert particular facts, the Court has noted the disagreement.

Plaintiff was a prisoner confined at the Jail pursuant to a contract with the United States Marshals Service ("USMS"), from December 2, 2016 until October 3, 2018, while awaiting trial for federal criminal charges.  (Dkt. 41-1 at ¶ 8; Dkt. 41-4 at ¶ 11; Dkt. 55 at 6).  On June 21, 2017, Plaintiff injured his left leg while playing handball at the Jail.  (Dkt. 41-1 at ¶ 15; Dkt. 55 at 6).  At approximately 3:55 p.m. on June 21, 2017, Plaintiff informed a Jail official that he had twisted his ankle while paying handball.  (Dkt. 41-1 at ¶ 16; Dkt. 55 at 6).  Plaintiff was provided with an ice pack at approximately 6:01 p.m. and was scheduled to see a nurse the next morning.  (Dkt. 41-1 at ¶ 17; Dkt. 55 at 6).

On June 22, 2017, Plaintiff was seen by Nurse Howe at approximately 10:50 a.m.  (Dkt. 41-1 at ¶ 18; Dkt. 55 at 6).  Nurse Howe examined Plaintiff's left leg and found no signs of swelling or bruising.  (Dkt. 41-1 at ¶ 19; Dkt. 55 at 6).  Plaintiff was given another ice pack and scheduled to see the Jail physician Dr. Aguirre on June 26, 2017.  (Dkt. 41-1 at ¶ 20; Dkt. 55 at 6).  Nurse Howe also advised Plaintiff to let someone know if his leg got worse in the meantime.  (Dkt. 41-5 at ¶ 15; Dkt. 41-9 at 3).  Plaintiff did not complain of worsening pain in his left leg between June 22, 2017, and June 26, 2017.  (Dkt. 41-1 at ¶ 21).

On June 26, 2017, Plaintiff was seen by Dr. Aguirre at approximately 8:00 a.m. (Dkt. 41-1 at ¶ 22; Dkt. 55 at 7).  Dr. Aguirre examined Plaintiff, noting that his left leg was sore and tender but showed no signs of bruising or swelling.  (Dkt. 41-1 at ¶ 23; Dkt. 55 at 7).  After diagnosing Plaintiff with a left calf contusion, Dr. Aguirre discontinued the Naproxen Plaintiff was taking for an unrelated shoulder issue, prescribed the anti-inflammatory Mobic, and ordered Plaintiff to rest and refrain from activities.  (Dkt. 41-1 at ¶ 24; Dkt. 41-6 at ¶ 10; Dkt. 41-9 at 92).  Plaintiff continued to work, serving food and cleaning the floors.  (Dkt. 41-1 at ¶ 25; Dkt. 41-7 at 14-15).  He initially lived on the second floor and continued using the stairs, but he eventually changed cells with someone on the first floor because of the pain.  (Dkt. 41-7 at 15).  He also tried to run and walk in the recreational area, but stopped because the pain was too much.  (*Id.* at 37).

The morning of June 29, 2017, Nurse Howe came to Plaintiff's cell for a medicine run, and Plaintiff again told her he was in pain.  (Dkt. 41-7 at 17-18).  Nurse Howe told Plaintiff he did not have a broken leg, because if he had a broken leg he would not be walking around.  (*Id.* at 18).  Plaintiff told her he had been limping for the past few weeks, and Nurse Howe told him to report it on the Jail's facility kiosk.  (*Id.* at 18).  At approximately 7:12 a.m., Plaintiff submitted a medical sick call request about his leg using the kiosk, stating that he was "in extreme pain" and that "meds don't help."  (Dkt. 41-1 at ¶ 26; Dkt. 41-9 at 4; Dkt. 55 at 7).

Nurse Howe notified Dr. Aguirre about Plaintiff's complaints at approximately 9:15 a.m., and Dr. Aguirre instructed Nurse Howe to arrange for an x-ray of Plaintiff's lower left leg.  (Dkt. 41-1 at ¶ 27; Dkt. 55 at 7).  The Jail does not have its own x-ray machine,

- 3 -

and prisoners must be transported to an outside medical facility to have imaging done. (Dkt. 41-1 at ¶ 14; Dkt. 55 at 6). Due to Plaintiff's status as a federal prisoner, he was not allowed to leave the Jail to receive outside medical treatment without authorization from the USMS except in cases of emergency. (Dkt. 41-1 at ¶ 9; Dkt. 41-14 at 4-5). On June 30, 2017, Nurse Howe sent a prisoner medical request form to the USMS, asking that an x-ray be taken of Plaintiff's lower left leg at an outside medical facility. (Dkt. 41-1 at ¶ 28; Dkt. 55 at 7). On the form, Nurse Howe marked that the urgency of the request was "Standard (>6 [weeks])" as opposed to an "Emergency," "Urgent (< 2 [weeks])," or "Routine (2-6 [weeks])." (Dkt. 41-9 at 70; Dkt. 55 at 8). On July 5, 2017, Plaintiff submitted another medical sick call request at the facility kiosk, stating that he could see some bruising and that he was worried that he had a fracture. (Dkt. 41-10 at 16). The USMS Office of Interagency Medical Services received approval of the prisoner medical request on July 10, 2017, and the USMS notified the Jail of the approval the same day. (Dkt. 41-1 at ¶ 29; Dkt. 55 at 8).

On July 11, 2017, less than two weeks after requesting approval from the USMS, Nurse Howe arranged for Plaintiff to be transported to Noyes Health Diagnostic Imaging for an x-ray of his left lower leg, and the x-ray was taken at approximately 2:36 p.m. that day. (Dkt. 41-1 at ¶¶ 30-31; Dkt. 55 at 8). The x-ray indicated Plaintiff had a mildly displaced distal fibular shaft fracture. (Dkt. 41-1 at ¶ 31; Dkt. 55 at 8). Plaintiff contends that after the x-ray results came back, the deputy who transported him called the Jail and yelled at someone on the other end of the line. (Dkt. 41-7 at 21-22). Noyes Health Diagnostic Imaging did not provide discharge instructions, and Plaintiff was initially

brought back to the Jail before being transported to the Noyes Hospital Emergency Department for further medical care and treatment.  (Dkt. 41-1 at ¶ 33; Dkt. 41-13 at 2; Dkt. 55 at 8).  At 10:06 p.m. on July 11, 2017, Plaintiff arrived at the emergency department where his leg was splinted, and his treating physician instructed him to use a wheelchair and be non-weightbearing.  (Dkt. 41-1 at ¶ 34; Dkt. 55 at 8).  The Jail provided Plaintiff with a wheelchair and crutches.  (Dkt. 41-1 at ¶ 35; Dkt. 41-7 at 23-24; Dkt. 41-9 at 4).

On July 12, 2017, Nurse Howe saw Plaintiff walking around on his splinted left leg and approached him about it.  (Dkt. 41-5 at ¶ 26).  Plaintiff stated he was not using his wheelchair because he could not sit still and that the back of the wheelchair was broken.  (*Id.*).  Plaintiff was provided with another wheelchair and another set of crutches.  (*Id.*).  That evening, Plaintiff filed a grievance regarding the medical care he had received with respect to his leg.  (Dkt. 41-1 at ¶ 37; Dkt. 41-12 at 1-5).

On July 14, 2017, at approximately 11:00 a.m., Plaintiff's left leg splint was re-wrapped and reinforced with ace bandages, and he was again ordered to be non-weightbearing.  (Dkt. 41-1 at ¶ 38; Dkt. 55 at 9).  Later that day, Plaintiff was taken to an appointment with an orthopedic specialist at Genesee Regional Orthopedics.  (Dkt. 41-1 at ¶ 39; Dkt. 55 at 9).  An x-ray was taken, and Plaintiff's leg showed signs of early healing.  (Dkt. 41-1 at ¶ 39; Dkt. 41-16 at 7-8; Dkt. 55 at 9).  Plaintiff was given a walking boot and ordered to remove it only for hygiene purposes, and was advised to continue using his wheelchair.  (Dkt. 41-1 at ¶ 39; Dkt. 55 at 9).  Plaintiff contends that when he asked the orthopedic specialist if the bone could be put back in place, the specialist told him the bone

was "past that time" because of the three-week wait.   (Dkt. 55 at 9).   A follow-up appointment was scheduled for three weeks later.   (Dkt. 41-1 at ¶ 39; Dkt. 55 at 9).

On July 18, 2017, Plaintiff's grievance was denied on the merits by Grievance Coordinator Sergeant Galvin because of Plaintiff's medical trips on July 11 and July 14, 2017.   (Dkt. 41-1 at ¶ 40; Dkt. 41-12 at 3, 5).   Plaintiff appealed the decision to the chief administrative officer, Chief Deputy Yasso, who investigated the matter and also denied Plaintiff's grievance on the merits.   (Dkt. 41-1 at ¶ 41; Dkt. 41-12 at 4).

On July 24, 2017, Plaintiff saw Dr. Aguirre at approximately 9:00 a.m.   (Dkt. 41-1 at ¶ 43; Dkt. 41-9 at 91).   Dr. Aguirre observed some lateral ankle swelling and requested that Plaintiff's follow-up orthopedic appointment be moved up if possible.   (Dkt. 41-1 at ¶ 43; Dkt. 41-9 at 91).   Nurse Howe called Genesee Regional Orthopedics to re-schedule Plaintiff's follow-up appointment to the soonest appointment available, which was August 1, 2017.   (Dkt. 41-1 at ¶¶ 44, 47; Dkt. 41-10 at 18).   On July 26, 2017, Plaintiff submitted a medical sick call request using the facility kiosk and claimed he was in need of an MRI. (Dkt. 41-1 at ¶ 45; Dkt. 41-10 at 18).   Plaintiff was informed that the orthopedic specialist would determine if he needed an MRI.   (Dkt. 41-10 at 18).   On July 27, 2017, Plaintiff submitted another medical sick call request using the facility kiosk regarding cramping in his left foot, and was advised that the cramping could be caused by his foot not getting full range of motion and to discuss his complaints at his orthopedic appointment.   (Dkt. 41-1 at ¶ 46; Dkt. 41-10 at 19).

On August 1, 2017, Plaintiff was seen by the orthopedic specialist.   (Dkt. 41-1 at ¶ 47).   Another x-ray was taken of Plaintiff's leg, and it was noted that his leg showed

"good early signs of healing," as well as "routine healing."  (Dkt. 41-16 at 6).  Plaintiff was told to continue using his walking boot and wheelchair for long distances, and another follow-up appointment was scheduled.  (Dkt. 41-1 at ¶ 47; Dkt. 41-16 at 6).  On August 28, 2017, Plaintiff was again seen by the orthopedic specialist, and an x-ray was taken. (Dkt. 41-1 at ¶ 48).  The x-ray showed that the fracture was in "good alignment position" with "excellent signs of early healing present."  (Dkt. 41-16 at 3).  The specialist told Plaintiff he could stop using his wheelchair, but to continue using his walking boot unless he was taking it off at night, and a follow-up appointment was scheduled.  (*Id.*).  On September 27, 2017, Plaintiff communicated to Nurse Howe that his leg was "feeling ok" and that he wanted to "get to normal moving around and exercising."  (Dkt. 41-5 at ¶ 37).

On October 9, 2017, Plaintiff was taken to his final follow-up appointment with the orthopedic specialist.  (Dkt. 41-1 at ¶ 49; Dkt. 55 at 9).  The x-ray showed his fracture was healed with "no acute findings noted."  (Dkt. 41-16 at 2).  The specialist told Plaintiff he could go back to wearing regular shoes and working into full activities, and that it could take him a month or two to get back to running and playing handball.  (*Id.*).  On October 23, 2017, Dr. Aguirre cleared Plaintiff to return to his position as a pod cleaner in the Jail. (Dkt. 41-1 at ¶ 50; Dkt. 41-9 at 4).

On November 13, 2017, Plaintiff presented to Nurse Howe complaining of swelling and occasional pain in his left ankle.  (Dkt. 41-1 at ¶ 51).  Nurse Howe provided Plaintiff with a soft ankle brace and scheduled an appointment for him to see Dr. Aguirre on November 20, 2017.  (*Id.*).  At the appointment with Dr. Aguirre, Plaintiff demonstrated no tenderness upon palpitation to the left ankle or calf.  (*Id.* at ¶ 52).  On December 9, 2017,

Plaintiff submitted a medical sick call request on the facility kiosk asking if a request had been put in for an MRI of his leg because it was still swollen, and he was notified that his inquiry had been relayed to the primary nurse.  (Dkt. 41-10 at 28).  Plaintiff made no further complaints to the Jail about his left leg after December 9, 2017, nor has he sought additional medical treatment for his left leg.  (Dkt. 41-1 at ¶¶ 53-57, 59; Dkt. 41-10 at 28-41; Dkt. 55 at 9).  Plaintiff contends that "[t]o this day" he tries to exercise and play handball, but he has pain in his left leg.  (Dkt. 55 at 9).

## II.   **Procedural Background**

Plaintiff filed the instant action on August 9, 2017 (Dkt. 1), and a motion for leave to proceed *in forma pauperis* (Dkt. 2).  On November 8, 2018, the Court issued a screening order granting Plaintiff's *in forma pauperis* motion and allowing his claims to proceed to service.  (Dkt. 5).  Defendants answered on January 3, 2019 (Dkt. 6), and the matter was referred to a magistrate judge for all pretrial matters excluding dispositive motions (Dkt. 7; Dkt. 42).  On November 14, 2019, Defendants filed their motion for summary judgment.  (Dkt. 41).  Plaintiff filed his motion for a jury trial on January 13, 2020 (Dkt. 50), as well as a timely response to the motion for summary judgment on March 24, 2020 (Dkt. 55).  Defendants' reply was timely filed on May 5, 2020.  (Dkt. 62).

## DISCUSSION

## I.   **Legal Standard**

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ.

P. 56(a).  The Court should grant summary judgment if, after considering the evidence in the light most favorable to the nonmoving party, the court finds that no rational jury could find in favor of that party.  *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

"The moving party bears the burden of showing the absence of a genuine dispute as to any material fact[.]"  *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014).  "Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial."  *Johnson v. Xerox Corp.*, 838 F. Supp. 2d 99, 103 (W.D.N.Y. 2011) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).  Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation."  *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (quoting *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011)).  Specifically, the non-moving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact."  *Brown*, 654 F.3d at 358.  Indeed, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

## II.  <u>Deliberate Indifference to a Serious Medical Need</u>

"To state a claim under 42 U.S.C. § 1983, the plaintiff must show that a defendant, acting under color of state law, deprived him of a federal constitutional or statutory right." *Sykes v. Bank of Am.*, 723 F.3d 399, 405-06 (2d Cir. 2013).  "As opposed to deliberate indifference claims brought by post-conviction prisoners—which arise under the Eighth Amendment—claims for deliberate indifference brought by state pretrial detainees arise under the Fourteenth Amendment."  *Blake v. Kelly*, No. 12 Civ. 7245(ER), 2014 WL 4230889, at *4 (S.D.N.Y. Aug. 26, 2014); *see Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) ("A pretrial detainee's claims . . . are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eight Amendment.").  Under current Second Circuit law, and based on the Supreme Court's decision in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), when a pretrial detainee brings § 1983 claims alleging deliberate indifference, the plaintiff must satisfy a two-prong test by showing: (1) he is incarcerated under conditions that are sufficiently serious so as to pose an unreasonable risk of serious damage to his health and constitute an objective deprivation of the right to due process; and (2) "the defendant-official acted intentionally . . . or recklessly failed to act with reasonable care to mitigate the risk . . . even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety."  *Darnell*, 849 F.3d at 29-30, 35.

A.    **Sufficiently Serious Deprivation—Objective Prong**

The Court finds that a reasonable juror looking at the evidence in the light most favorable to Plaintiff could not find that the delay in diagnosis of his fracture, from June 22 until July 11, 2017, posed an unreasonable risk of serious damage to his health.

Objectively, a medical need is serious for constitutional purposes if it presents "'a condition of urgency' that may result in 'degeneration' or 'extreme pain.'" *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (quoting *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994); *Rolkiewicz v. City of New York*, No. 1:16-CV-06771 (ALC), 2020 WL 1033792, at *12 (S.D.N.Y. Mar. 3, 2020) ("The objective prong is satisfied by evidence showing that the medical need in question was serious, meaning one that contemplates a condition of urgency, one that may produce death, degeneration, or extreme pain." (quotation omitted)).  Although "[t]here is no settled, precise metric to guide a court in its estimation of the seriousness of a prisoner's medical condition," *Brock v. Wright*, 315 F.3d 158, 162 (2d Cir. 2003), several factors help "guide the analysis, including (1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) whether the plaintiff suffers from 'the existence of chronic and substantial pain,'" *Colon v. City of New York*, No. 08 CIV. 3142 (HB), 2009 WL 1424169, at *6 (S.D.N.Y. May 21, 2009) (quoting *Brock*, 315 F.3d at 162); *see Horace v. Gibbs*, 802 F. App'x 11, 14 (2d Cir. 2020) ("There is no 'static test' to determine whether a deprivation is sufficiently serious; instead, the conditions themselves must be evaluated in light of contemporary standards of decency." (quoting *Darnell*, 849 F.3d at 30)).

When a prisoner alleges "a temporary delay or interruption in the provision of otherwise adequate medical treatment, we focus on the seriousness of the particular risk of harm that resulted from the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone." *Bellotto v. County of Orange*, 248 F. App'x 232, 236 (2d Cir. 2007) (quotations omitted). A "delay in medical care does not amount to a constitutional claim 'unless the delay cause[d] substantial harm.'" *Williams v. Raimo*, No. 9:10-CV-245 MAD/GHL, 2011 WL 6026111, at \*5 (N.D.N.Y. Dec. 2, 2011) (alteration in original) (quoting *Evans v. Manos*, 336 F. Supp. 2d 255, 262 (W.D.N.Y. 2004)). "In evaluating the seriousness of the delay in treatment, a court may consider the absence of adverse medical effects or demonstrable physical injury associated with such delay or interruption." *Swinton v. Livingston County*, No. 15-CV-00053A(F), 2018 WL 4637376, at \*10 (W.D.N.Y. Sept. 27, 2018) (quotation omitted), *report and recommendation adopted sub nom. Swinton v. Schinski*, No. 15-CV-53-A, 2019 WL 5694314 (W.D.N.Y. Nov. 4, 2019); *see Smith v. Carpenter*, 316 F.3d 178, 187 (2d Cir. 2003) (footnote omitted) ("[T]he actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm.").

In the instant matter, the issue presently before the Court is not whether Plaintiff's leg fracture constitutes a serious medical need; instead, the Court must determine if the delay in treating Plaintiff's leg fracture, from when it occurred on June 22, 2017, until when it was diagnosed on July 11, 2017, caused substantial harm. The Court finds that a

reasonable trier of fact looking at the record before the Court in the light most favorable to Plaintiff could not find that he suffered substantial harm from the delay.

The medical evidence of record establishes that the approximate three-week delay in diagnosing Plaintiff's leg fracture did not have long-term effects. At his August 1, 2017, orthopedic appointment, it was noted that Plaintiff's leg showed "good early signs of healing," as well as "routine healing" (Dkt. 41-16 at 6), and at his August 28, 2017, orthopedic appointment, Plaintiff's fracture was in "good alignment position" with "excellent signs of early healing present" (*id.* at 3). At Plaintiff's final follow-up appointment on October 9, 2017, the x-ray taken showed his fracture was healed with "no acute findings noted." (*Id.* at 2).

Plaintiff contends that he asked the orthopedic specialist if the bone could be put back in place at his initial appointment on July 14, 2017, and the specialist told him the bone was "past that time" because of the three-week wait. (Dkt. 55 at 9). However, no medical evidence of record corroborates Plaintiff's claims. *Cf. Usavage v. Port Auth. of N.Y. & N.J.*, 932 F. Supp. 2d 575, 597 (S.D.N.Y. 2013) ("[U]nsubstantiated claims of nerve damage, in the absence of corroborating medical evidence, are insufficient to support a claim of excessive force from handcuffing[.]" (quoting *Matthews v. City of New York*, 889 F. Supp. 2d 418, 442 (E.D.N.Y. 2012))). To the contrary, as discussed above, the medical evidence of record shows that Plaintiff's fracture was in "good alignment position," and that "no acute findings" were noted. (Dkt. 41-16 at 2-3). "[N]o reasonable person would undertake the suspension of disbelief necessary to give credit to the allegations made" by Plaintiff. *Jeffreys v. City of New York*, 426 F.3d 549, 555 (2d Cir. 2005); *see O'Connor v.*

*Pierson*, 426 F.3d 187, 202 (2d Cir. 2005) ("Lay people are not qualified to determine . . . medical fitness, whether physical or mental; that is what independent medical experts are for."); *Green v. Senkowski*, 100 F. App'x 45, 47 (2d Cir. 2004) (finding the plaintiff's proffered self-diagnosis without any medical evidence, and contrary to the medical evidence on record, insufficient to defeat summary judgment on a deliberate indifference claim). Even if the orthopedic specialist had represented that the fracture could not be put back into place at his initial appointment as Plaintiff contends, the medical evidence of record at Plaintiff's subsequent appointments shows that the bone was in fact properly aligned. (Dkt. 41-16 at 2). "Since [P]laintiff has failed to raise a genuine dispute of material fact which could lead a rational trier of fact to find in his favor on his [deliberate indifference] claim, there is no genuine issue for trial." *Pulliam v. Lilly*, No. 07-CV-1243 SJF/AKT, 2010 WL 935383, at *5 (E.D.N.Y. Mar. 11, 2010).

Additionally, a reasonable trier of fact looking at the record in the light most favorable to Plaintiff could not find that Plaintiff's pain amounted to a serious medical need. Although courts have recognized that "[s]evere pain can itself constitute a serious medical need," *McMillon v. Davidson*, 873 F. Supp. 2d 512, 514 (W.D.N.Y. 2012), the record before the Court shows that Plaintiff's pain was not so bad as to significantly affect his daily activities, *see Chance v. Armstrong*, 143 F.3d 698, 702-03 (2d Cir. 1998) (noting that "the presence of a medical condition that significantly affects an individual's daily activities" is "relevant to the inquiry into whether a given medical condition is a serious one"). It is undisputed that during the less than three weeks between Plaintiff's injury and diagnosis, Plaintiff was walking, and that although he stopped engaging in recreational

activities like running, he continued to work in jobs that required standing and walking, *i.e.*, serving food and cleaning the floors.  (Dkt. 41-1 at ¶ 25; Dkt. 41-7 at 14-15, 18); *see Powell v. Fischer*, No. 08-CV-0371, 2010 WL 843877, at *8 (N.D.N.Y. Mar. 9, 2010) (finding that the plaintiff continuing "to work in labor intensive jobs . . . contradicts contentions that his pain interfered with activities of daily living").  While a fractured leg "may be considered 'sufficiently serious' to warrant constitutional protection. . . .  the circumstances in which [Plaintiff]'s treatment for [his] condition[] was allegedly delayed fall[s] short of the high bar set by the Second Circuit for delay-based deliberate-indifference claims."  *Feliciano v. Anderson*, No. 15-CV-4106 (LTS) (JLC), 2017 WL 1189747, at *11 (S.D.N.Y. Mar. 30, 2017) (noting that Plaintiff made "no allegations that his conditions were life-threatening and fast-degenerating, or that they worsened because of the delay, or that the delay was punitive").

In light of both the lack of long-term medical effects from the delayed diagnosis and Plaintiff's continued engagement in daily activities during that approximate three-week period from injury to diagnosis, the Court finds a reasonable trier of fact could only determine that the delay in Plaintiff's treatment did not amount to a substantial risk of serious harm.

### B.    **Deliberate Indifference**

Even if an issue of fact existed with respect to the objective prong, the evidence of record does not support a finding that any Defendant acted with deliberate indifference.

"A plaintiff can prove deliberate indifference by showing that the defendant official recklessly failed to act with reasonable care to mitigate the risk that the condition posed to

the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to [the plaintiff's] health or safety." *Charles v. Orange County*, 925 F.3d 73, 87 (2d Cir. 2019) (alteration in original) (emphasis and quotation omitted). Unlike claims for deliberate indifference pursuant to the Eighth Amendment, "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley*, 576 U.S. at 369-97. However, "[a] plaintiff must show something more than mere negligence to establish deliberate indifference in the Fourteenth Amendment context." *Id.* (quotation omitted). "Thus, mere medical malpractice is not tantamount to deliberate indifference, but it may rise to the level of deliberate indifference when it involves culpable recklessness, i.e., an act or a failure to act . . . that evinces a conscious disregard of a substantial risk of serious harm." *Id.* (alteration in original) (quotation omitted).

In the instant matter, the evidence of record does not show that any Defendant delayed Plaintiff's treatment out of a conscious disregard of Plaintiff's injury. To the contrary, the care Plaintiff received at the Jail was generally attentive. The day of the injury, Plaintiff was provided with an ice pack and scheduled to see Nurse Howe the next morning. (Dkt. 41-1 at ¶ 17; Dkt. 55 at 6). Nurse Howe examined Plaintiff's left leg, scheduled him to see Dr. Aguirre four days later, and advised Plaintiff to let someone know if his leg got worse in the meantime. (Dkt. 41-1 at ¶¶ 19-20; Dkt. 41-5 at ¶ 15; Dkt. 41-9 at 3; Dkt. 55 at 6). Dr. Aguirre examined Plaintiff, diagnosed him with a leg contusion, and prescribed him an anti-inflammatory. (Dkt. 41-1 at ¶¶ 23-24; Dkt. 55 at 7). Three days later, Plaintiff again complained to Nurse Howe about his pain, and after he submitted

a sick call request, Nurse Howe relayed Plaintiff's complaints to Dr. Aguirre that same morning.  (Dkt. 41-1 at ¶¶ 26-27; Dkt. 41-9 at 4; Dkt. 55 at 7).  Dr. Aguirre instructed Nurse Howe to arrange for an x-ray of Plaintiff's lower left leg, and Nurse Howe began that process the next morning.  (Dkt. 41-1 at ¶¶ 27-28; Dkt. 55 at 7).  When Plaintiff asked to be switched to a first-floor cell instead of a second-floor cell so as to avoid going up and down the stairs, he was moved to a cell on the first floor.  (Dkt. 41-7 at 15).  The USMS notified the Jail the same day it approved the x-ray, and Nurse Howe arranged for Plaintiff's x-ray to occur the next day.  (Dkt. 41-1 at ¶¶ 29-31; Dkt. 55 at 8).  Additionally, Plaintiff was seen by an orthopedic specialist within days after his fracture diagnosis, and his follow-up appointments with the specialist were made as ordered, and in one instance even moved up after Dr. Aguirre expressed some concern about swelling in Plaintiff's ankle.  (Dkt. 41-1 at ¶¶ 43-44).

Nor does the evidence of record viewed in the light most favorable to Plaintiff demonstrate that Defendants should have known the seriousness of Plaintiff's injury. During Nurse Howe's initial examination of Plaintiff, she found no signs of swelling or bruising.  (Dkt. 41-1 at ¶ 19; Dkt. 55 at 6).  Dr. Aguirre also did not see signs of bruising or swelling during his examination of Plaintiff, which led to his diagnosis of a leg contusion.  (Dkt. 41-1 at ¶ 23; Dkt. 55 at 7).  Additionally, Plaintiff did not complain of pain between the two appointments (Dkt. 41-1 at ¶ 21), and before Plaintiff's diagnosis, he continued to walk and to work by serving food and cleaning floors.  (Dkt. 41-1 at ¶ 25; Dkt. 41-7 at 14-15).  Plaintiff even noted that Nurse Howe told him she did not think Plaintiff had a broken leg because he had been walking around.  (Dkt. 41-7 at 18).  These

facts do not illustrate that Nurse Howe and Dr. Aguirre were consciously disregarding Plaintiff's injury, but instead show two medical professionals treating Plaintiff's medical condition as initially (albeit mistakenly) diagnosed.  This is further illustrated by Nurse Howe's treatment of Plaintiff the day after his fracture was diagnosed: Nurse Howe admonished him for walking around on his leg and made sure he was provided with an adequate wheelchair and crutches.  (Dkt. 41-5 at ¶ 26).  At worst, the initial misdiagnosis of Plaintiff's leg amounts to malpractice, and "[n]either 'mere negligence,' nor 'mere malpractice' by medical officials . . . will meet the second prong of the Fourteenth Amendment standard." *Gonzalez v. Hannah*, No. 3:19CV1522(VLB), 2020 WL 3256869, at *6 (D. Conn. June 16, 2020) (quoting *Charles*, 925 F.3d at 87); *see Beaman v. Unger*, 838 F. Supp. 2d 108, 110 (W.D.N.Y. 2011) ("The most that his allegations show, however, is that the two nurses and Dr. Shiekh misdiagnosed his injuries, and failed to recognize the severity of those injuries. Such allegations might conceivably show malpractice, but they do not state [a deliberate indifference] claim.").  In other words, "Plaintiff has failed to demonstrate that the delay was intended to prolong his pain or exacerbate his injury, or that [Dr. Aguirre or Nurse Howe] acted recklessly," and "the facts are wholly inadequate to demonstrate as much."  *Figueroa v. County of Rockland*, No. 16-CV-6519 (NSR), 2018 WL 3315735, at *6 (S.D.N.Y. July 5, 2018).

Plaintiff also argues that Nurse Howe's failure to mark "Emergency" on the prisoner medical request form sent to the USMS and instead marking that the request was "Standard" is sufficient to demonstrate deliberate indifference.  (Dkt. 55 at 79).  However, the record before the Court viewed in the light most favorable to Plaintiff does not support

that Nurse Howe marked "Standard" on the medical request form even though she knew or should have known that Plaintiff's leg was fractured.  Instead, the record demonstrates that Nurse Howe reasonably believed that Plaintiff did not have a broken leg but a leg contusion, and that she marked "Standard" on the request form as a result of that diagnosis.  Nurse Howe's actions taken as a result of the misdiagnosis "fall[] far short of the 'culpable recklessness' required under the deliberate indifference standard."  *Melvin v. County of Westchester*, No. 14-CV-2995 (KMK), 2016 WL 1254394, at *8 (S.D.N.Y. Mar. 29, 2016); *Figueroa*, 2018 WL 3315735, at *6 ("Plaintiff's allegations against [the nurse] are insufficient to meet the *mens rea* prong of the Fourteenth Amendment analysis.  Medical malpractice, misdiagnosis and the decision not to treat based on an erroneous view that the condition is benign or trivial does not rise to the level of deliberate indifference." (quotations omitted)).

The cases cited by Plaintiff, aside from being out-of-Circuit, are easily distinguishable from the instant matter.  In *Mandel v. Doe*, 888 F.2d 783 (11th Cir. 1989), the court found there was sufficient evidence to support a deliberate indifference claim where the defendant refused to tell his superior about the plaintiff's condition, obtain an x-ray of the plaintiff's leg, or have the plaintiff examined by a doctor.  *Id.* at 789.  Similarly, in *Carswell v. Bay County*, 854 F.2d 454 (11th Cir. 1988), sufficient evidence to support a claim for deliberate indifference was found where the record showed the defendants failed to advise the doctor of the plaintiff's condition or to otherwise make sure he received medical attention.  *Id.* at 457.  In the instant matter, Nurse Howe set up Plaintiff's appointment with Dr. Aguirre and consistently informed the doctor about Plaintiff's

complaints (Dkt. 41-1 at ¶¶ 20, 27; Dkt. 55 at 6-7), Dr. Aguirre ordered an x-ray which Nurse Howe arranged (Dkt. 41-1 at ¶ 27; Dkt. 55 at 7), and Nurse Howe set up Plaintiff's appointments with Noyes Health Diagnostic Imaging and the outside orthopedic specialist (Dkt. 41-1 at ¶¶ 30, 39, 44, 47; Dkt. 55 at 8).  Additionally, Plaintiff's reliance on *Rogers v. Evans*, 792 F.2d 1052 (11th Cir. 1986), for the proposition that "one episode of gross conduct would be sufficient for a jury to make a finding of deliberate indifference," *id.* at 1062, is misplaced because, as discussed above, a reasonable trier of fact could not find that any of the conduct by Nurse Howe or Dr. Aguirre rises to the level necessary to meet the deliberate indifference standard.

Therefore, the Court grants Defendants' motion as to the claims against Nurse Howe and Dr. Aguirre.

## C.    Remaining Defendants

The Court further finds that the record viewed in the light most favorable to Plaintiff cannot support claims against Sergeant Galvin, Chief Yasso, or Livingston County.

To establish liability against an official under § 1983, a plaintiff must allege that individual's personal involvement in the alleged constitutional violation; it is not enough to assert that the defendant is a link in the chain of command.  *See McKenna v. Wright*, 386 F.3d 432, 437 (2d Cir. 2004); *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995). Moreover, the theory of *respondeat superior* is not available in a § 1983 action.  *See Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003).  A supervisory official can be found to be personally involved in an alleged constitutional violation in one of several ways:

(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon*, 58 F.3d at 873 (citing *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)).

A reasonable trier of fact viewing the record in the light most favorable to Plaintiff could not find that Sergeant Galvin or Chief Deputy Yasso violated Plaintiff's constitutional rights. Sergeant Galvin investigated and ultimately denied Plaintiff's grievance based on the medical treatment he received at the Jail for his leg (Dkt. 41-1 at ¶ 40; Dkt. 41-12 at 3, 5), and after Plaintiff appealed the grievance denial, Chief Deputy Yasso also investigated the matter and denied Plaintiff's grievance on the merits (Dkt. 41-1 at ¶ 41; Dkt. 41-12 at 4). Because, as discussed above, the Court finds a reasonable trier of fact could not determine that Plaintiff's medical treatment at the Jail rose to the level of deliberate indifference, Plaintiff's claims against Sergeant Galvin and Chief Deputy Yasso also fail due to the lack of an underlying constitutional violation. *See Nunez v. Donahue*, No. 912CV1071BKSCFH, 2015 WL 13744630, at *16 (N.D.N.Y. Nov. 23, 2015) (finding summary judgment against the plaintiff should be granted as to claims for denial of grievances where the plaintiff "failed to establish any underlying constitutional violations"), *report and recommendation adopted*, No. 912CV1071BKSCFH, 2016 WL 29616 (N.D.N.Y. Jan. 4, 2016); *see Kravitz v. Leis*, No. 917CV0600TJMTWD, 2019 WL 1332774, at *5 (N.D.N.Y. Feb. 11, 2019) (collecting cases), *report and recommendation*

*adopted*, No. 917CV0600TJMTWD, 2019 WL 1331999 (N.D.N.Y. Mar. 25, 2019), *aff'd sub nom. Kravitz v. Leis*, 803 F. App'x 547 (2d Cir. 2020).

Similarly, a municipality or other local government may be liable under § 1983 only "if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (citing *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978)). "[T]o establish municipal liability under § 1983, a plaintiff must prove that 'action pursuant to official municipal policy' caused the alleged constitutional injury." *Cash v. County of Erie*, 654 F.3d 324, 333 (2d Cir. 2011) (quoting *Connick*, 563 U.S. at 60). Official municipal policy includes "the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick*, 563 U.S. at 61.

In the instant matter, a reasonable trier of fact could not find that Livingston County violated Plaintiff's constitutional rights. As with Sergeant Galvin and Chief Deputy Yasso, the claims against Livingston County must fail due to the lack of an underlying constitutional violation. *See Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006) ("Because the district court properly found no underlying constitutional violation, its decision not to address the municipal defendants' liability under *Monell* was entirely correct."). Additionally, the record before the Court viewed in the light most favorable to Plaintiff does not demonstrate that Livingston County's policy of requiring approval for medical treatment from the USMS unreasonably delayed Plaintiff's treatment. To the contrary, the USMS approved Plaintiff's x-ray within nine days of receipt of the medical

request form despite the urgency of the request being marked as "Standard (>6 [weeks])." (Dkt. 41-1 at ¶ 29; Dkt. 41-9 at 70; Dkt. 55 at 8).  Moreover, after Plaintiff was diagnosed with a fracture, the Jail and the USMS approved treatment for Plaintiff's leg that same day. (Dkt. 41-1 at ¶ 33; Dkt. 41-13 at 2; Dkt. 55 at 8).

Accordingly, the Court grants Defendants' motion as to the claims against Sergeant Galvin, Chief Yasso, and Livingston County.

## III.   <u>Motion for Jury Trial</u>

Because the Court grants Defendants' motion for summary judgment, Plaintiff's motion for a jury trial is denied as moot.  The Court also notes that, in any event, Plaintiff had already demanded a jury trial in his Complaint.  (*See* Dkt. 1 at 7).

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants' motion for summary judgment (Dkt. 41) is granted, and Plaintiff's motion for a jury trial (Dkt. 50) is denied as moot.  The Clerk of Court is directed to enter judgment in favor of Defendants and close this case.

SO ORDERED.


ELIZABETH A. WOLFORD
United States District Judge

Dated:  July 15, 2020
       Rochester, New York

- 23 -